1   MᶜGREGOR W. SCOTT
    United States Attorney
2   KIMBERLY A. SANCHEZ
    ROSS PEARSON
3   Assistant United States Attorney
    501 I Street, Suite 10-100
4   Sacramento, CA 95814
    Telephone:  (916) 554-2700
5   Facsimile:   (916) 554-2900

6
    Attorneys for Plaintiff
7   United States of America

8                    IN THE UNITED STATES DISTRICT COURT

9                      EASTERN DISTRICT OF CALIFORNIA

10

11  UNITED STATES OF AMERICA,                  CASE NO.  1:18-CR-207-LJO

12                         Plaintiff,          UNITED STATES' OPPOSITION TO LORENZO
                                               AMADOR'S MOTION TO SUPPRESS WIRETAP
13                 v.                          AND SEARCH WARRANTS

14  LORENZO AMADOR, et al.,                    DATE: January 10, 2020
                                               TIME: 8:30 a.m.
15                         Defendants.         COURT: Hon. Lawrence J. O'Neill

16

17

18

19

20

21      **UNITED STATES' OPPOSITION TO LORENZO AMADOR'S MOTION TO SUPPRESS
                       WIRETAP AND SEARCH WARRANTS**
22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.    INTRODUCTION ..................................................................................................................1

II.   STATEMENT OF RELEVANT FACTS ............................................................................2

      A.     State Wiretap 18-002 .................................................................................3

      B.     State Wiretap 18-002 Extension 1 .............................................................8

      C.     Federal Search Warrant 1:18-sw-146 .....................................................10

      D.     Federal Search Warrant 1:18-sw-238-EPG ............................................13

III.  DISCUSSION ..................................................................................................................14

      A.     The Court should deny Amador's motion to suppress wiretaps 18-002 and 18-002 Extension 1 because substantial evidence supported the judge's finding that there was probable cause that Amador was using his Facebook account and phone to discuss and participate in the MS-13 enterprise and deal drugs in furtherance of the enterprise. .................................................................14

             1.     Probable Cause Standard .................................................................14

             2.     State Law Authorizes Wiretaps for Violations of California Penal Code 186.22 .................................................................15

             3.     Both wiretaps set forth probable cause that Amador was using his Facebook account and phone to discuss the MS-13 criminal street gang and deal drugs in furtherance of the gang. .............................................16

      B.     Even if the state wiretap was based solely on probable cause that Amador was committing marijuana crimes, the evidence obtained is still admissible in federal court because federal law governs the admissibility of wiretapped communications. .................................................................18

      C.     This Court should deny Amador's request for a Franks hearing, because Amador has not identified any misleading fact or omission—let alone a material misleading fact or omission—in wiretap 18-002 to support a Franks hearing.................................................................20

             1.     Standard for a Franks Hearing .................................................................20

             2.     Amador has identified no facts that were misleading about his use of Target Telephone #6 in the affidavit in support of wiretap 18-002. .....................21

             3.     The statement about Amador's residence was not material, because probable cause would have existed even if the affidavit stated that the Jennings address was Amador's family address. .................................................22

      D.     The Court should deny Amador's motion to suppress the federal search warrants for his alleged Facebook accounts, because he has not presented evidence that the accounts were his and that he has standing to challenge the search of the accounts. .................................................23

E.  The Court should deny Amador's motion to suppress the federal search warrants for his Facebook accounts, because both warrants were supported by probable cause that Amador was using his accounts to distribute marijuana and using his accounts to communicate with other members of MS-13, which is a wholly illegitimate enterprise. .....................................................24

    1.  Probable Cause.................................................................................24

    2.  Association with a wholly illegitimate RICO is itself a basis for probable cause to search for evidence of the enterprise. ......................................24

    3.  Substantial evidence supported the magistrate judges' findings of probable cause because Amador was using his Facebook accounts to distribute marijuana and to communicate with fellow members of the MS-13 enterprise, which is a "wholly illegitimate" enterprise...........................26

IV.  CONCLUSION.........................................................................................29

# TABLE OF AUTHORITIES

**Cases**

*Franks v. Delaware*,
    438 U.S. 154 (1978)...............................................................21, 22

*Illinois v. Gates*,
    462 U.S. 213 (1983)...............................................14, 15, 18, 24

*People v. Albillar*,
    51 Cal. 4th 47 (2010) ........................................................... 15

*People v. Valenzuela*,
    7 Cal. 5th 415 (2019) ........................................................... 16

*United States v. Acosta*,
    110 F. Supp. 2d 918 (E.D.Wi. 2000) ........................................ 26

*United States v. Arnold*,
    No. 15-20652, 2017 WL 4036312 (E.D. Mich. Sept. 13, 2017).......25, 28

*United States v. Bennett*,
    219 F.3d 1117 (9th Cir. 2000) ................................................ 20

*United States v. Bishop*,
    264 F.3d 919 (9th Cir. 2001) ..............................................22, 24

*United States v. Brown*,
    761 F.2d 1272 (9th Cir. 1985) ................................................ 14

*United States v. Butz*,
    982 F.2d 1378 (9th Cir. 1993) ................................................ 19

*United States v. Chavez Miranda*,
    306 F.3d 973 (9th Cir. 2002) ..............................................20, 24

*United States v. Chesher*,
    678 F.2d 1353 (9th Cir. 1982) ................................................ 21

*United States v. Del Vizo*,
    918 F.2d 821 (9th Cir. 1990) ................................................. 15

*United States v. Fannin*,
    817 F.2d 1379 (9th Cir. 1987) ................................................ 24

*United States v. Garay*,
    938 F.3d 1108 (9th Cir. 2019) .............................................24, 27

*United States v. Hall*,
    543 F.2d 1229 (9th Cir. 1976) ................................................ 19

*United States v. Homick*,
  964 F.2d 899 (9th Cir. 1992) ................................................................. 19

*United States v. Keen*,
  508 F.2d 986 (9th Cir. 1974) ................................................................. 19

*United States v. Krupa*,
  658 F.3d 1174 (9th Cir. 2011) ............................................................... 24

*United States v. Mejia*,
  545 F.3d 179 (2d Cir. 2008) .................................................................. 28

*United States v. Meling*,
  47 F.3d 1546 (9th Cir. 1995) ........................................................... 14, 20

*United States v. Morrison*,
  988 F.2d 124 (9th Cir. 1993) ................................................................. 22

*United States v. Ocampo*,
  937 F.2d 485 (9th Cir. 1991) ................................................................. 24

*United States v. Palacios*,
  677 F.3d 234 (9th Cir. 2012) ................................................................. 28

*United States v. Prime*,
  363 F.3d 1028 (9th Cir. 2004) ............................................................... 20

*United States v. Rubio*,
  727 F.2d 786 (9th Cir. 1983) ....................................................... 24, 25, 29

*United States v. Shryock*,
  342 F.3d 948 (9th Cir. 2003) ................................................................. 20

*United States v. Tham*,
  960 F.2d 1391 (9th Cir. 1992) ............................................................... 15

*United States v. Vasquez*,
  654 F.3d 880 (9th Cir. 2011) ................................................................. 25

*United States v. York*,
  2017 WL 5068143 (E.D. Cal. Sept. 29, 2017) .................................... 18, 20

*United States v. Zermeno*,
  66 F.3d 1058 (9th Cir. 1995) ................................................................. 23

*Warden v. Hayden*,
  387 U.S. 294 (1967) .............................................................................. 24

**Statutes**

18 U.S.C. § 1962(c) ....................................................................................... 24

18 U.S.C. § 2518 ........................................................................................... 14

18 U.S.C. § 2518(3)(a) ................................................................................... 14

18 U.S.C. § 2518(3)(b) ................................................................................................... 14

18 U.S.C. §§ 2515 ........................................................................................................... 18

Cal. Penal Code § 186.22(a) ........................................................................................... 15

Cal. Penal Code § 186.22(e) ........................................................................................... 15

Cal. Penal Code § 186.22(f) ............................................................................................ 15

Cal. Penal Code § 629.52(a)(1) ...................................................................................... 15

California Penal Code 186.22 ...................................................................................... i, 15

MᶜGREGOR W. SCOTT
United States Attorney
KIMBERLY A. SANCHEZ
ROSS PEARSON
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>               Plaintiff,<br><br>           v.<br><br>LORENZO AMADOR, et al.,<br><br>               Defendants. | CASE NO. 1:18-CR-207-LJO<br><br>UNITED STATES' OPPOSITION TO LORENZO AMADOR'S MOTION TO SUPPRESS WIRETAP AND SEARCH WARRANTS<br><br>DATE: January 10, 2020<br>TIME: 8:30 a.m.<br>COURT: Hon. Lawrence J. O'Neill |

I. **INTRODUCTION**

On October 18, 2019, Lorenzo Amador filed a motion to suppress two state wiretaps (Wiretaps 18-002 and 18-002 Extension 1) and two federal search warrants (1:18-SW-146 and 1:18-SW-238-EPG) for Facebook accounts identified as his. (Dkt. 226, Mot. to Suppress Wiretaps and Search Warrants, p. 21) (referred to as "Mot. to Suppress"). Amador also requests a *Franks* hearing for state wiretap 18-002, which he claims was a wiretap based on "misleading facts." (Dkt. 226, Mot. to Suppress Wiretaps and Search Warrants, p. 20).

This Court should deny Amador's motion in its entirety. First, the Court should deny Amador's motion to suppress the state wiretaps. Despite Amador's misleading claims to the contrary, the state wiretaps were not solely based on probable cause that Amador was distributing marijuana but rather probable cause that Amador was using his Facebook and phone to discuss and facilitate business for the

MS-13 gang, a violent enterprise that engaged in murders, assaults, kidnappings, extortions, and drug dealing. And even if the Court were to accept Amador's claim that the state wiretaps were solely based on probable cause that Amador was distributing marijuana, federal law, not state law, governs admissibility of evidence in federal court and therefore the communications intercepted on Amador's Facebook and telephone accounts would still be admissible.

Second, the Court should deny Amador's request for a *Franks* hearing on the wiretaps, because Amador has not identified any misleading statements or omissions at all, let alone any misstatements or omissions that rise to the level of materiality required for a *Franks* hearing.

Third, the Court should deny Amador's motion to suppress the two federal Facebook warrants. As a threshold matter, Amador has not provided any evidence to meet his burden that he was the user of any of the Facebook accounts that he challenges for purposes of establishing standing. Regardless, even if Amador, in his reply brief, does provide some evidence for his standing to challenge these searches, the affidavits for the search of the Facebook accounts provided probable cause to believe that Amador was using his Facebook accounts to distribute marijuana and to communicate about MS-13, a wholly illegitimate enterprise.

## II.     STATEMENT OF RELEVANT FACTS

This case is part of a years-long racketeering investigation into the MS-13 enterprise in Mendota, California. From 2015 to 2018, members and associates of the MS-13 enterprise in Mendota extorted businesses, sold drugs, kidnapped and assaulted rivals, and committed several murders. (Dkt. 227-2, Affidavit in Support of Federal Wiretap 1:18-sw-204, Bates 68–93).[1] Investigators learned that MS-13 enterprise members routinely used Facebook to communicate with each other, and that many of the MS-13 enterprise members use multiple Facebook accounts. (Dkt. 230, Search Warrant 1:18-sw-146-BAM, Bates 4013). During the investigation, therefore, investigators obtained over one hundred search warrants and several state and federal wiretaps for Facebook accounts used by MS-13 enterprise members and associates. Investigators also obtained state and federal wiretaps for several phones used by MS-13 enterprise members and associates.

---

[1]All citations to the record are to the Bates number, not the page number of the document cited.

UNITED STATES' OPPOSITION TO LORENZO
AMADOR'S MOTION TO SUPPRESS WIRETAP
AND SEARCH WARRANTS

The wiretaps and search warrants—along with other investigative techniques—showed that a group of MS-13 enterprise members and associates were distributing drugs in Mendota and committing violent assaults against rival MS-13 gang members.  (*See generally*, Dkt. 1, Crim. Compl.).  A grand jury charged sixteen MS-13 members and associates with two counts of violent crime in aid of racketeering and one count of conspiracy to distribute and possess with intent to distribute controlled substances.  (Dkt. 125, Indictment).

Lorenzo Amador was one of the MS-13 members charged with violent crime in aid of racketeering.  (Dkt. 125, Indictment).  In the middle of the afternoon on August 12, 2018, Amador and another MS-13 associate pulled to the side of the road, hopped out of their SUV, beat and stabbed a rival gang member, and then fled.  (Dkt. 1, Crim. Compl., pp. 30–37).  The victim lost consciousness and was transported to the hospital, where he underwent emergency surgery.  (Dkt. 1, Crim. Compl., pp. 30–31).  A few hours after the assault, Amador sent a message to fellow MS-13 member and co-defendant Jose Navarette-Mendez telling Navarette-Mendez, "you guys better not go out, because we plucked a chicken," a common saying that MS-13 members use to report that they have committed or attempted to commit a murder.  (Dkt. 1, Crim. Compl., p 31).

On October 18, 2019, Amador filed a motion to suppress two state wiretaps (Wiretaps 18-002 and 18-002 Extension 1) and two federal search warrants (1:18-SW-146 and 1:18-SW-238-EPG) for Facebook accounts identified as his.  (Dkt. 226, Mot. to Suppress Wiretaps and Search Warrants, p. 21) (referred to as "Mot. to Suppress").  Amador also requests a *Franks* hearing for state wiretap 18-002, which he claims was a wiretap based on "misleading facts."  (Dkt. 226, Mot. to Suppress Wiretaps and Search Warrants, p. 20).  Amador also moves to suppress "all evidence obtained by use of [the] tainted evidence" from these searches.  (Dkt. 226, Mot. to Suppress, p. 22).

A.    <u>State Wiretap 18-002</u>

State wiretap 18-002 was authorized on June 15, 2018, by Fresno County Superior Court Judge Arlan Harrell.  The wiretap authorized the interception of several phones and Facebook accounts used by MS-13 members, including the interception of Target Telephone #6 and Target Facebook Account #9, both used by Lorenzo Amador.  Fresno County Sheriff's Office Detective Kimberly Sharp was the affiant for the application for State Wiretap 18-002.  (Dkt. 228-2, Attachment 5, Aff. in Support of 18-

002 Application). In short, the affidavit explained that there was probable cause to believe that MS-13 was a criminal street gang under California law, and that Amador was an MS-13 member who was engaged in marijuana sales and also used his phone and Facebook account to communicate with other MS-13 members and relay messages to MS-13 leader Denis Barrera-Palma.

The affidavit set forth that MS-13 is a criminal street gang as defined in California law, because MS-13 members had committed a pattern of criminal activity by committing three murders and one drug dealing offense. (Dkt. 229, Attachment 5, Aff. in Support of 18-002 Application, Bates 1781–1787). The affidavit explained that MS-13 members had committed fourteen murders, at least two of which were ordered by MS-13 leader Denis Barrera-Palma. (Dkt. 229, Attachment 5, Aff. in Support of 18-002 Application, Bates 1790). MS-13 members also used Facebook to discuss the collection of extortion money. (Dkt. 229, Attachment 5, Aff. in Support of 18-002 Application, Bates 1791, 1785).

The affidavit for State Wire 18-002 also incorporated the affidavit for federal wiretap 1:18-SW-204-LJO. (Dkt. 229, Attachment 5, Aff. in Support of 18-002 Application, Bates 1742). The federal affidavit further explained the nature of the MS-13 enterprise. It explained that MS-13 is engaged in extortion, drug sales, assault, kidnapping, firearms sales, and murders. (*See generally* Dkt. 227-2, Attachment 1, Aff. in Support of 1:18-SW-204 Application, Bates 59–93).

The federal affidavit also listed specific examples of each of these activities. For instance, in March 2016, MS-13 members sent an extortion letter to several Mendota businesses telling them that they had to "pay a commission, rent, [or] tax" to "La Mara Salvatrucha" or they would "suffer the consequences." (Dkt. 227-2, Attachment 1, Aff. in Support of 1:18-SW-204 Application, Bates 69). In 2017, MS-13 leader Denis Barrera-Palma communicated with fellow MS-13 member Claudia Lizaola to order a pound of methamphetamine. Dkt. 227-2, Attachment 1, Aff. in Support of 1:18-SW-204 Application, Bates 71–72). Barrera-Palma sent MS-13 member Francisco Lizano to Southern California to pick up the methamphetamine from Lizaola. (Dkt. 227-2, Attachment 1, Aff. in Support of 1:18-SW-204 Application, Bates 71–72). On March 1, May 5, and September 9, 2017, MS-13 members assaulted rival gang members. (Dkt. 227-2, Attachment 1, Aff. in Support of 1:18-SW-204 Application, Bates 72–75). And on fourteen different occasions from 2015 to 2017, MS-13 members in Mendota committed murders, many of which were murders or rival gang members or fellow MS-13 members.

(Dkt. 227-2, Attachment 1, Aff. in Support of 1:18-SW-204 Application, Bates 76–89). As the federal affidavit explained, many discussions about the assaults, drug dealing, kidnapping, and murders took place through Facebook discussions between MS-13 members. (*See generally* Dkt. 227-2, Attachment 1, Aff. in Support of 1:18-SW-204 Application, Bates 59–93).

The state affidavit also explained how Amador was identified as the user of Target Telephone 6 and Target Facebook 9. Target Telephone 6 was subscribed in the name of "Antonio Mejia," the same name Amador used for his Facebook accounts. (Dkt. 229, Attachment 5, Aff. in Support of 18-002 Application, Bates 1770). Target Telephone 6 was also subscribed at 1949 Jennings Street, Mendota, which the affidavit explained was the "same address Amador used during his contact with law enforcement on September 18, 2017" at which time Amador identified himself as Lorenzo Amador. (Dkt. 229, Attachment 5, Aff. in Support of 18-002 Application, Bates 1770). Target Telephone 6 was also listed in the phone of another MS-13 member as the phone number for "Catrachh," which was a possible misspelling of Amador's moniker of "Catracho." (Dkt. 229, Attachment 5, Aff. in Support of 18-002 Application, Bates 1770). Target Facebook 9 was identified as Amador's Facebook account by the several selfie-style photos of Amador, the multiple messages that Amador received at Target Facebook 9 that called him by his moniker of "Catracho," and the fact that his account was registered with his true birthdate. (Dkt. 229, Attachment 5, Aff. in Support of 18-002 Application, Bates 1755).

The state affidavit also specifically set forth probable cause related to Lorenzo Amador by discussing his status as an MS-13 member and his use of Facebook and his phone to sell marijuana for MS-13 and provide MS-13 leader Denis Barrera-Palma with information about other MS-13 members. The affidavit explained that Lorenzo Amador was believed to be an MS-13 member. Amador had previously been stopped on September 18, 2017, when Amador was contacted with an MS-13 recruiter, and he also had Facebook contact with multiple MS-13 members. (Dkt. 229, Attachment 5, Aff. in Support of 18-002 Application, Bates 1798). Amador also received a Facebook message that included four MS-13 members with their faces covered standing in front of a wall with "13-MS" painted on it. (Dkt. 229-1, Attachment 5, Aff. in Support of 18-002 Application, Bates 1801). Each of the four MS-13 members was carrying a weapon—a knife, handgun, machete, and baseball bat—and one of the MS-13 members made an MS-13 hand sign. (Dkt. 229-1, Attachment 5, Aff. in Support of 18-002 Application,

UNITED STATES' OPPOSITION TO LORENZO
AMADOR'S MOTION TO SUPPRESS WIRETAP
AND SEARCH WARRANTS

Bates 1801). Amador was the MS-13 member in the picture who was carrying a knife:



(Dkt. 229-1, Attachment 5, Aff. in Support of 18-002 Application, Bates 1801–02).

Amador also used his Facebook account to connect MS-13 leader Denis Barrera-Palma with other suspected MS-13 members and leaders. For instance, on March 22, 2018, Barrera-Palma sent a Facebook message to Amador to say that he needed "Sicario's" number. (Dkt. 229, Attachment 5, Aff. in Support of 18-002 Application, Bates 1799). Amador responded by sending Barrera-Palma a Salvadoran phone number, which Amador described as a WhatsApp number. (Dkt. 229, Attachment 5,

UNITED STATES' OPPOSITION TO LORENZO
AMADOR'S MOTION TO SUPPRESS WIRETAP
AND SEARCH WARRANTS

Aff. in Support of 18-002 Application, Bates 1799).

About a week and a half later, Amador sent Barrera-Palma a Facebook message to tell Barrera-Palma, "They sent a message that they need to talk."  (Dkt. 229-1, Attachment 5, Aff. in Support of 18-002 Application, Bates 1800).   Barrera-Palma later asked Amador to "get me the number for a homie from Santa Maria," and Amador told Barrera-Palma that he would.  (Dkt. 229-1, Attachment 5, Aff. in Support of 18-002 Application, Bates 1800).  Amador then tried to call Barrera-Palma through Facebook, and when Barrera-Palma did not answer Amador sent a message telling Barrera-Palma that one of the homies wanted to talk to Barrera-Palma urgently.  (Dkt. 229-1, Attachment 5, Aff. in Support of 18-002 Application, Bates 1800).  Barrera-Palma called Amador back then sent Amador a message saying, "Send me the number for the homie."  (Dkt. 229-1, Attachment 5, Aff. in Support of 18-002 Application, Bates 1800).  Amador responded by sending Barrera-Palma a phone number, and told Barrera-Palma "It's Maleante's from Santa Maria."  (Dkt. 229-1, Attachment 5, Aff. in Support of 18-002 Application, Bates 1800).  Maleante is a known MS-13 gang member in Santa Maria, California.  (Dkt. 229-1, Attachment 5, Aff. in Support of 18-002 Application, Bates 1800).

The next day, Amador again sent Barrera-Palma a message with contact information for a suspected MS-13 member.  On April 4, 2018, Barrera-Palma told Amador to get a phone number for "the homie in Sivar."  (Dkt. 229-1, Attachment 5, Aff. in Support of 18-002 Application, Bates 1801).  Sivar is a slang term for "El Salvador," and a "homie" is a high-ranking MS-13 member.  (Dkt. 229-1, Attachment 5, Aff. in Support of 18-002 Application, Bates 1801 n.23).  Amador responded by sending Barrera-Palma the same Salvadoran phone number he had sent on March 22, 2018.  (Dkt. 229-1, Attachment 5, Aff. in Support of 18-002 Application, Bates 1801).

The following day, Amador sent Barrera-Palma contact information for another MS-13 member.  On April 5, 2018, Amador sent Barrera-Palma a message with a phone number and the statement, "It's the one the homie sent. That homie says that he called the homie from Francis."  (Dkt. 229-1, Attachment 5, Aff. in Support of 18-002 Application, Bates 18012).  Francis is a clique of MS-13 in Los Angeles.  (Dkt. 229-1, Attachment 5, Aff. in Support of 18-002 Application, Bates 18012).

Amador also used his Facebook account to discuss and sell marijuana, which is "one of the primary means of generating revenue for the MS-13 criminal enterprise."  (Dkt. 229, Attachment 5, Aff.

in Support of 18-002 Application, Bates 1799).  On March 21, 2018, Barrera-Palma told Amador that

the group was on the way to pick him up, and Amador should prepare marijuana and all the money.

(Dkt. 229, Attachment 5, Aff. in Support of 18-002 Application, Bates 1799).  About ten minutes later,

Barrera-Palma sent Amador a message that the group was outside Amador's house and Amador should

come out.  (Dkt. 229, Attachment 5, Aff. in Support of 18-002 Application, Bates 1799).

       Finally, the state affidavit explained that pen register data showed that Amador was in contact

with multiple other MS-13 members.  (Dkt. 229-1, Attachment 5, Aff. in Support of 18-002 Application,

Bates 1802–05).

     **B.**      **State Wiretap 18-002 Extension 1**

       Extension 1 to State Wiretap 18-002 was authorized on July 14, 2018, by Fresno County

Superior Court Judge Arlan Harrell, and it extended the wiretap on Target Telephone 6 and Target

Facebook 9 for a second thirty-day period.  (*See generally* Dkt. 228-1, Attachment 3, Order Authorizing

18-002 Extension 1).  Detective Sharp again was the affiant for the application for 18-002 Extension 1,

and Detective Sharp's affidavit explained that in the thirty days since the first wiretap was signed,

Amador continued to participate in MS-13 gang activity, including drug sales.

       Specifically, on July 9, 2018, Amador and four other MS-13 members were stopped with a

pound of marijuana and 3.5 grams of methamphetamine as they returned from Los Angeles, where

intercepted calls and messages showed they had acquired the drugs to bring back to Mendota and sell

them.  (Dkt. 228-2, Attachment 4, Aff. in Support of 18-002 Extension 1, Bates 1609–1616).  Prior to

the trip, MS-13 leader Denis Barrera-Palma called fellow MS-13 member Jefferson Guevara and the two

discussed the prices for marijuana, cocaine, and methamphetamine for the gang.  (Dkt. 228-2,

Attachment 4, Aff. in Support of 18-002 Extension 1, Bates 1610).[2]  MS-13 members then started to

collect money, and other intercepted calls and messages indicated that the members started to travel

from Mendota to Los Angeles.  (Dkt. 228-2, Attachment 4, Aff. in Support of 18-002 Extension 1, Bates

---

[2] In his Motion to Suppress, Amador describes these communications as "discussions about
'weed.'"  (Dkt. 226, Mot. to Suppress Wiretap, p. 18).  Amador is wrong.  First, the affidavit for 18-002
Extension 1 explains that these communications were about "the cost and logistics of purchasing a
pound of marijuana, an ounce of methamphetamine, and an ounce of cocaine."  (Dkt. 228-2, Attachment
4, Aff. in Support of 18-002 Extension 1, Bates 1610).  Second, the fact that MS-13 members were, in
fact, caught with methamphetamine also shows that these communications were not only about "weed."

UNITED STATES' OPPOSITION TO LORENZO
AMADOR'S MOTION TO SUPPRESS WIRETAP
AND SEARCH WARRANTS

1610–1614). One MS-13 member, in fact, specifically said, "I'm receiving some money here in order to

2   go to Los Angeles." (Dkt. 228-2, Attachment 4, Aff. in Support of 18-002 Extension 1, Bates 1612).

3        While in Los Angeles, intercepts and GPS information showed that the MS-13 members who

4   had travelled from Mendota met up with Jefferson Guevara, Amador, and other MS-13 members and

5   obtained narcotics. (Dkt. 228-2, Attachment 4, Aff. in Support of 18-002 Extension 1, Bates 1614). On

6   the way back from Los Angeles, the MS-13 members, including Amador, were stopped in a car and

7   caught with one pound of marijuana and 3.5 grams of methamphetamine. (Dkt. 228-2, Attachment 4,

8   Aff. in Support of 18-002 Extension 1, Bates 1614). During the planning and execution of this trip, pen

9   register data showed that Amador made several Voice Over Internet Protocol calls through Facebook to

10  his fellow MS-13 members who were along for the drug-buying trip: Jefferson Guevara, Jose Navarette-

11  Mendez, and Ever Membreno. (Dkt. 228-2, Attachment 4, Aff. in Support of 18-002 Extension 1, Bates

12  1615–1616).

13       In addition to this drug trafficking activity, Amador was seen in Los Angeles meeting with

14  another MS-13 member after that MS-13 member had asked for a gun and talked about wanting to

15  murder someone. (Dkt. 228-2, Attachment 4, Aff. in Support of 18-002 Extension 1, Bates 1609).

16  Specifically, on June 27, 2018, MS-13 member Wilfredo Espinoza was intercepted talking to fellow

17  MS-13 member Jefferson Guevara. (Dkt. 228-2, Attachment 4, Aff. in Support of 18-002 Extension 1,

18  Bates 1609). Espinoza asked Guevara to get a gun and talked about wanting to murder someone, and

19  Guevara and Espinoza agreed to meet at MacArthur Park in Los Angeles. (Dkt. 228-2, Attachment 4,

20  Aff. in Support of 18-002 Extension 1, Bates 1609). Investigators went to MacArthur Park after these

21  intercepted calls and found Espinoza and Guevara, along with Amador. (Dkt. 228-2, Attachment 4, Aff.

22  in Support of 18-002 Extension 1, Bates 1609).

23       Finally, the affidavit for the extension explained that even though Amador had not had a lot of

24  activity on Target Telephone 6 and Target Facebook Account 9 during the first thirty day period,

25  probable cause still existed that Amador would use these accounts to discuss MS-13 gang activity. (Dkt.

26  228-2, Attachment 4, Aff. in Support of 18-002 Extension 1, Bates 1617). In particular, the affidavit

27  explained, "Although Amador's accounts showed low activity during interception, Amador, being with

28  Guevara and other MS-13 gang members during the commission of a crime, particularly a violent crime,

UNITED STATES' OPPOSITION TO LORENZO
AMADOR'S MOTION TO SUPPRESS WIRETAP
AND SEARCH WARRANTS

will cause Amador to use Target Telephone #6 and Target Facebook Account #9 to discuss the criminal

activity." (Dkt. 228-2, Attachment 4, Aff. in Support of 18-002 Extension 1, Bates 1617).

### C.     Federal Search Warrant 1:18-sw-146

On April 5, 2018, U.S. Magistrate Judge Barbara McAuliffe signed a warrant authorizing the

search of 38 Facebook accounts. (Dkt. 230, Attachment 9, First Facebook Warrant, Bates 3984).

Relevant to Amador's motion to suppress, the warrant authorized the search of four Facebook accounts

which, at the time, were believed to be used by MS-13 member Mario Garcia: (1) Facebook Account -

39244, Vanity Name "Antonio Mejia" (referred to as "Subject Account 32"); (2) Facebook Account -

21588, Vanity Name "Antonio Mejia" (referred to as "Subject Account 33"); (3) Facebook Account -

88206, Vanity Name "Antonio Mejia" (referred to as "Subject Account 34"); and (4) Facebook Account

-40984, Vanity Name "Mejia Mejia" (referred to as "Subject Account 35"). (Dkt. 230, Attachment 9,

First Facebook Warrant, Bates 4001).

Like the wiretaps, the affidavit in support of the warrants also explained that MS-13 is an

enterprise engaged in drug trafficking and violent acts, and that—based on the affiant's training and

experience—gang members often use social media to discuss criminal activity, and that all four

Facebook accounts relating to Amador were accounts used by an MS-13 member.

Pages 8 to 17 of the warrant affidavit detail the MS-13 enterprise and establish that MS-13 is an

enterprise in Mendota, California. (Dkt. 230, Attachment 9, First Facebook Warrant, Bates 4004–4013).

Specifically, the affidavit explains that MS-13 has been designated a Transnational Criminal

Organization and, as such, U.S. authorities may freeze and seize their assets and U.S. citizens are

prohibited from engaging in transactions with MS-13. (Dkt. 230, Attachment 9, First Facebook

Warrant, Bates 4004). MS-13 in Mendota was responsible for fourteen homicides from 2015 to 2017.

(Dkt. 230, Attachment 9, First Facebook Warrant, Bates 4008). MS-13 members in Mendota fall into

two cliques, and they have gang symbols, such as the color blue, the letters VLS, PVLS, and MS, and

devil horns. (Dkt. 230, Attachment 9, First Facebook Warrant, Bates 4008). MS-13 members in

Mendota also engaged in drug sales, extortion, possession of firearms, extortion, murder, and

intimidation of rivals. (Dkt. 230, Attachment 9, First Facebook Warrant, Bates 4008).

MS-13 members also follow established rules. (Dkt. 230, Attachment 9, First Facebook

Warrant, Bates 4010–4012).  These rules include various rules requiring MS-13 members to communicate gang business: they must "maintain communication" with other members, "report all business," and "report accounts every last or beginning of the month."  (Dkt. 230, Attachment 9, First Facebook Warrant, Bates 4011–4012).

The affidavit also explained that MS-13 members in Mendota frequently communicated by Facebook.  (Dkt. 230, Attachment 9, First Facebook Warrant, Bates 4013).  It stated that "much of the communication between these [MS-13] gang members, and their associates are through Facebook messenger," and that MS-13 members often use "multiple Facebook accounts."  (Dkt. 230, Attachment 9, First Facebook Warrant, Bates 4013).

In a later section entitled "Gangs Use of Social Media," the affidavit also explained that, in the affiant's training and experience, gang members use social media for a number of purposes:

- Gang members use social media to communicate with other known gang members and/or associates. (Dkt. 230, Attachment 9, First Facebook Warrant, Bates 4045).

- Gang members use social media to discuss "future or past gang related criminal acts" and to discuss "current gang related crimes committed by members and/or associates within the gang." (Dkt. 230, Attachment 9, First Facebook Warrant, Bates 4045).

- Gang members use social media to "bring up and discuss their past violent acts in order to continue to gain influence and respect from within the gang culture for their violent acts." (Dkt. 230, Attachment 9, First Facebook Warrant, Bates 4045).

- Gang members take "photographs and/or videos of themselves or their associates in possession of firearms or other illegally possessed weapons." (Dkt. 230, Attachment 9, First Facebook Warrant, Bates 4046).

- Gang members will take "pictures and/or videos of crimes they have committed to prove to higher-ranking gang members that they in fact did commit a violent act." (Dkt. 230, Attachment 9, First Facebook Warrant, Bates 4046).

- Gang members' Facebook accounts "often contain numerous pieces of gang indicia which can help prove their membership in the gang."  (Dkt. 230, Attachment 9, First Facebook Warrant, Bates 4046).

UNITED STATES' OPPOSITION TO LORENZO
AMADOR'S MOTION TO SUPPRESS WIRETAP
AND SEARCH WARRANTS

- Gang members message each other about their crimes, and thus messages "sent from one gang member to another gang member will also likewise prove or dispel a motive for a given crime and thus help detectives in determining if a crime was in fact committed for the benefit of, at the direction of, or in association with other gang members." (Dkt. 230, Attachment 9, First Facebook Warrant, Bates 4046).

The affidavit also explained how Facebook works, what information Facebook stores, and why the search of a Facebook account may provide important information about gang activity: "information stored in connection with a Facebook account may provide crucial evidence of the 'who, what, why, when, where, and how' of the criminal conduct under investigation, thus enabling the United States to establish and prove each element." (Dkt. 230, Attachment 9, First Facebook Warrant, Bates 4050).

Finally, the affidavit explained that Subject Accounts 32, 33, 34, and 35 were all being used by an MS-13 member. First, Subject Account 32—which Amador concedes there was probable cause to search—had two selfie-style photographs of an individual investigators initially believed to be Mario Garcia, a leader of the PVLS clique of MS-13. (Dkt. 230, Attachment 9, First Facebook Warrant, Bates 4040). It also featured "several images…consistent with MS-13 gang member drawings" and the account was "friends with several other accounts…listed that have been identified as active accounts used by MS-13 gang members," including PVLS leader Denis Barrera. (Bates 4040). Subject Account 32 was also used to discuss marijuana distribution, and in one instance the user of Subject Account 32 told fellow MS-13 member Wilber Lainez that he had been stopped by a police officer with marijuana and a switchblade. (Dkt. 230, Attachment 9, First Facebook Warrant, Bates 4041) ("[The police officer] stopped us and I had weed, I got a ticket, and I also had a switchblade in the bag….").

Subject Accounts 33, 34, and 35 all relate to Subject Account 32, because the affidavit sets forth that all three accounts seemed to be used by the same MS-13 member. Subject Account 33 had multiple selfies of an individual believed to be Mario Garcia, including one of the same photos displayed in Subject Account 32. (Dkt. 230, Attachment 9, First Facebook Warrant, Bates 4041). This account also had "several images consistent with MS-13 gang member drawings" and the Facebook account was "friends with several accounts that ha[d] been identified as active accounts by active MS-13 gang members," including Barrera. (Dkt. 230, Attachment 9, First Facebook Warrant, Bates 4041). Subject

Account 34 also had four selfie-style photographs of an individual believed to be Mario Garcia, including two of the same photos as in Subject Account 32. (Dkt. 230, Attachment 9, First Facebook Warrant, Bates 4041–4042). And finally, Subject Account 35 also had several selfie-style photographs of an individual believed to be Mario Garcia, including several photographs of the individual believed to be Garcia that appeared to be the same photographs displayed in the other accounts. (Dkt. 230, Attachment 9, First Facebook Warrant, Bates 4042).

###    D.    Federal Search Warrant 1:18-sw-238-EPG

On June 15, 2018, U.S. Magistrate Judge Erica Grosjean signed a warrant authorizing the search of 62 Facebook accounts associated with MS-13 members. (Dkt. 230-3, Attachment 12, Second Facebook Warrant, Bates 8523). The warrant included a search of the same four accounts authorized by Magistrate Judge McAuliffe on April 5, 2018, that Amador now challenges: (1) Facebook Account -39244, Vanity Name "Antonio Mejia" (referred to as "Subject Account 32"); (2) Facebook Account -21588, Vanity Name "Antonio Mejia" (referred to as "Subject Account 33"); (3) Facebook Account -88206, Vanity Name "Antonio Mejia" (referred to as "Subject Account 34"); and (4) Facebook Account -40984, Vanity Name "Mejia Mejia" (referred to as "Subject Account 35"). (Dkt. 230-3, Attachment 12, Second Facebook Warrant, Bates 8536). The main difference between the two warrants is that the later warrant, signed by Magistrate Judge Grosjean, expanded the timeframe for the search of the Facebook accounts from the initial time period authorized by Magistrate Judge McAuliffe. (*Compare* Dkt. 230, Attachment 9, First Facebook Warrant, Bates 3987 (authorizing search from January 1, 2016, to April 5, 2018), *with* Dkt. 230-3, Attachment 12, Second Facebook Warrant, Bates 8526 (authorizing search from January 1, 2015, to January 1, 2016, and April 6, 2018, to June 15, 2018)).

For the probable cause for these four accounts, there were only two substantive differences between the affidavit for the warrant signed by Magistrate Judge Grosjean on June 15, 2018, and the affidavit for the earlier warrant signed by Magistrate Judge McAuliffe signed on April 5, 2018. First, the later affidavit explained that even though these accounts were initially identified as belonging to Mario Garcia, "further investigation and Amador's contacts with law enforcement" along with "the Facebook content" led investigators to believe the account was, in fact, used by Amador. (Dkt. 230-3, Attachment 12, Second Facebook Warrant, Bates 8570). Second, the later affidavit noted that Amador's

Facebook account had received two pictures featuring four MS-13 members—including Amador—holding weapons and posing in front of MS-13 graffiti.  (Dkt. 230-3, Attachment 12, Second Facebook Warrant, Bates 8577).  One of the MS-13 members was also making an MS-13 gang sign with his hand.  (Dkt. 230-3, Attachment 12, Second Facebook Warrant, Bates 8577).

The rest of the probable cause for this later warrant is the same as the earlier warrant: MS-13 members were engaged in a criminal enterprise (Dkt. 230-3, Attachment 12, Second Facebook Warrant, Bates 8541–8547); they used Facebook to discuss enterprise activity (Dkt. 230-3, Attachment 12, Second Facebook Warrant, Bates 8547); Facebook messages would provide evidence of discussions of this enterprise and gang activity (Dkt. 230-3, Attachment 12, Second Facebook Warrant, Bates 8604–8610); and MS-13 members also use multiple Facebook accounts (Dkt. 230-3, Attachment 12, Second Facebook Warrant, Bates 8547).

### III.  DISCUSSION

**A.**  **The Court should deny Amador's motion to suppress wiretaps 18-002 and 18-002 Extension 1 because substantial evidence supported the judge's finding that there was probable cause that Amador was using his Facebook account and phone to discuss and participate in the MS-13 enterprise and deal drugs in furtherance of the enterprise.**

1.  Probable Cause Standard

A district judge authorizing a wiretap must enter several statutorily required findings of probable cause.  *United States v. Meling*, 47 F.3d 1546, 1551–52 (9th Cir. 1995).  The judge must find probable cause to believe (1) that an individual is committing, has committed, or is about to commit specified offenses (18 U.S.C. § 2518(3)(a)); (2) that communications relevant to that offense will be intercepted through the wiretap (18 U.S.C. § 2518(3)(b)); and (3) that the individual who is the focus of the wiretap investigation will use the tapped phone (18 U.S.C. § 2518 (3)(d)).  Looking only to the four corners of the wiretap application, the Court will uphold the wiretap if there is a "substantial basis" for these findings of probable cause.  *Id.*; *see Illinois v. Gates*, 462 U.S. 213, 236 (1983).

The standard of probable cause governing electronic surveillance is the same as that for any other search warrant.  *United States v. Brown*, 761 F.2d 1272, 1274–75 (9th Cir. 1985).  Therefore, as with search warrants, a court should issue an order authorizing wire interceptions if the totality of the circumstances set forth in the supporting affidavit demonstrate that "there is a fair probability" that the

target was using the telephone in furtherance of the stated illegal activity.  *See Gates*, 462 U.S. at 238; *United States v. Del Vizo*, 918 F.2d 821, 825 (9th Cir. 1990).  Following *Illinois v. Gates*, the Ninth Circuit applies a practical, commonsense approach in examining the totality of the circumstances for the probable cause analysis.  *United States v. Tham*, 960 F.2d 1391, 1395 (9th Cir. 1992).

The decision of a court that there is probable cause to issue an order authorizing electronic surveillance is entitled to substantial deference, and a motion to suppress does not prompt *de novo* review.  Rather, a magistrate judge's "determination of probable cause should be paid great deference by reviewing courts" and should be upheld so long as the magistrate had a "substantial basis for... conclud[ing]" that a search would uncover evidence of wrongdoing" *Gates*, 462 U.S. at 236.

2.    State Law Authorizes Wiretaps for Violations of California Penal Code 186.22

Under California law, a judge may authorize a wiretap if he finds that there is probable cause to believe that an individual has committed, or is about to commit, a list of enumerated offenses, including drug offenses, murder, "any felony violation of Section 186.22," weapons offenses, and human trafficking offenses.  Cal. Penal Code § 629.52(a)(1)–(6).

Included in this list is Section 186.22, part of California's Street Terrorism Enforcement and Prevention Act.  Section 186.22 provides punishment for "any person who actively participates in any criminal street gang with knowledge that its members engage in, or have engaged in, a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang."  Cal. Penal Code § 186.22(a).  The term "pattern of criminal gang activity" means that the gang has committed at least two or more predicate acts on separate occasions within three years.  Cal. Penal Code § 186.22(e).  A "criminal street gang" is a group of three or more persons whose primary activities include committing of the predicate acts listed in subsection (e).  Cal. Penal Code § 186.22(f).

There are three elements to participation in a criminal street gang: "(1) active participation in a criminal street gang, in the sense of participation that is more than nominal or passive; (2) knowledge that the gang's members engage in or have engaged in a pattern of criminal gang activity; and (3) the willful promotion, furtherance, or assistance in any felonious criminal conduct by members of that gang."  *People v. Albillar*, 51 Cal. 4th 47, 56 (2010).  While misdemeanor conduct does not amount to

"felonious criminal conduct," a defendant may be convicted of violating Section 186.22(a) even if he does not personally commit a felony if he promotes, furthers, or assists a specific felony "committed by gang members and who know of the gang's pattern of criminal gang activity." *People v. Valenzuela*, 7 Cal. 5th 415, 422 (2019).

       3.     <u>Both wiretaps set forth probable cause that Amador was using his Facebook account and phone to discuss the MS-13 criminal street gang and deal drugs in furtherance of the gang.</u>

Both state wiretaps extensively detailed the MS-13 enterprise's pattern of gang activity and they both explained that Amador was an active MS-13 member who discussed MS-13 gang activity. First, 18-002 described Amador as a "facilitator between Barrera-Palma and MS-13 members in other geographical locations," (Dkt. 229, Attachment 5, Aff. in Support of 18-002 Application, Bates 1755) and it explained why: Amador used his Facebook account to serve as an intermediary between Mendota MS-13 leader Denis Barrera-Palma and other MS-13 leaders in other geographic locations. For instance, on March 22, 2018, Amador provided Barrera-Palma with a Salvadoran phone number for "Sicario," which appeared to be the moniker of an MS-13 member.

A week and a half later, Amador acted as a go-between for Barrera-Palma and MS-13 members in Santa Maria, telling Barrera-Palma that "they" sent a message that "they need to talk" and that one of the "homies" wanted to talk to Barrera-Palma urgently. When Barrera-Palma needed help contacting a "homie" from Santa Maria, he asked Amador to get him the number for a "homie." Amador had no problem doing so: Amador specifically identified an MS-13 member in Santa Maria and gave Barrera-Palma his phone number. This incident not only showed that Amador had connections with other MS-13 members in other parts of the state, but the fact that other MS-13 gang members (who Amador refers to as "they") had sent Amador a message that "they need to talk" shows that Amador was also communicating about MS-13 gang activity with these MS-13 members from other cliques.

Amador continued to show his ability to connect Barrera-Palma with other MS-13 members. The next day, Barrera-Palma asked Amador for contact information for "the homie in Sivar," slang for El Salvador, and Amador sent Barrera-Palma a Salvadoran phone number. The following day, Amador sent Barrera-Palma a message with a phone number and the statement, "It's the one the homie sent. That homie says that he called the homie from Francis." Again, this communication shows not only that

Amador had connections with other MS-13 members, but that he was receiving MS-13-related messages from those members and relaying those messages to Barrera-Palma.

In short, the affidavit detailed that on four different occasions in the span of just two weeks, Amador provided Barrera-Palma with contact information for other MS-13 members and relayed messages from other cliques in different parts of California and El Salvador. All of these examples of Amador facilitating discussions between Barrera-Palma and other MS-13 members were detailed in the affidavit for State Wire 18-002 (Dkt. 229, Attachment 5, Aff. in Support of 18-002 Application, Bates 1797–1803), and they show that Amador was more than simply a marijuana dealer. He was an MS-13 member who was so connected with other cliques that he was relaying messages to the Mendota leader and providing him with instructions of which other MS-13 members to contact, how he could reach them, and when he should call them. In authorizing the wiretap, Superior Court Judge Harrell found probable cause that Amador would continue to use his Facebook account and phone to discuss the MS-13 gang and that intercepted communications on this account would likely reveal the names, identities, phone numbers, actions, and other planned criminal activities of the MS-13 criminal street gang that had committed murder, extortion, assault, kidnapping, and drug dealing. And he was also communicating over Facebook about selling marijuana for MS-13, which was "one of the primary means of generating revenue for the MS-13 criminal enterprise." Judge Harrell's probable cause finding was supported by substantial evidence, and this Court should deny Amador's motion to suppress state wiretap 18-002.

Second, the extension to 18-002 relied not only on the original probable cause to wiretap Amador, but also the fact that in the first days of interception Amador and other MS-13 members had gone to Los Angeles, bought a pound of marijuana and 3.5 grams of methamphetamine, and started bringing them back to Mendota to sell. During this timeframe, Amador had engaged in multiple VOIP calls with MS-13 members which were unable to be intercepted. However, this ongoing criminal activity for the MS-13 gang and the fact that Amador continued to communicate with other MS-13 members in the same timeframe that they set up a deal to purchase one pound of marijuana and 3.5 grams of methamphetamine shows that Amador was still communicating about MS-13 gang activity. Since the initial wiretap was supported by probable cause that Amador was communicating with other MS-13 members and distributing drugs on behalf of MS-13, and in the thirty days of wiretapped calls

1  Amador was caught working with MS-13 members to distribute marijuana and methamphetamine, there

2  was substantial evidence to support the second wiretap extension as well.  This Court should deny

3  Amador's motion to suppress wiretap 18-002 Extension 1.

4  　　　Amador argues that the wiretaps were based solely on probable cause that Amador was

5  distributing marijuana.  (Dkt. 226, Mot. to Suppress, p. 17) ("No such probable cause is detailed in the

6  state affidavit, or in the incorporated prior federal affidavit for any crime not involving marijuana.").  In

7  doing so he ignores the totality of the probable cause and takes a myopic focus on marijuana discussions

8  that ignores his larger role as a facilitator for MS-13.  This Court's job, however, is to look at the totality

9  of the circumstances, *Gates*, 462 U.S. at 238, and looking at the totality of the circumstances also

10  requires the Court to disregard Amador's attempts to rewrite and mischaracterize the affidavits so he can

11  artificially narrow the probable cause set forth in the affidavits.

12  　　　Clearly as shown above, Amador is wrong that the affidavits were based solely on probable

13  cause that Amador was distributing marijuana.  Both wiretap affidavits detailed that Amador was a key

14  player in the MS-13 gang, a member who showed an ability to connect MS-13 leader Denis Barrera-

15  Palma with members in other parts of the state and world, and who relayed messages from other cliques.

16  He was also a player in MS-13's drug distribution, including a member who helped pick up marijuana

17  and methamphetamine from Los Angeles to bring it back to Mendota.  Looking at the totality of the

18  circumstances, there was a substantial basis to find probable cause for the wiretaps.  The Court should

19  deny Amador's motion.

20  　　　**B.**　　**Even if the state wiretap was based solely on probable cause that Amador was
　　　committing marijuana crimes, the evidence obtained is still admissible in federal
21  　　　court because federal law governs the admissibility of wiretapped communications.**

22  　　　Suppression of evidence obtained from a state wiretap is only a remedy if the state wiretap

23  violates federal law.  *United States v. York*, No. 1:16-CR-00069-LJO, 2017 WL 5068143, at *3 (E.D.

24  Cal. Sept. 29, 2017).  Section 2515 states that no intercepted communications may be used in trial if the

25  disclosure of the communications "would be in violation of this chapter," and Section 2518(10) allows

26  an "aggrieved person" to move to suppress intercepted communications on the grounds that "the

27  communication was unlawfully intercepted."  18 U.S.C. §§ 2515, 2518(10)(a)(i).

28  　　　While the statute does not specify what law—state or federal—governs the admissibility of

UNITED STATES' OPPOSITION TO LORENZO
AMADOR'S MOTION TO SUPPRESS WIRETAP
AND SEARCH WARRANTS

communications intercepted pursuant to a state wiretap, the Ninth Circuit has made clear that federal law governs. *United States v. Homick*, 964 F.2d 899, 903 (9th Cir. 1992). "Evidence obtained pursuant to a state court wiretap authorization is not subject to suppression in federal court if that evidence was obtained in compliance with federal law." *Id.* Whether a wiretap violated state law therefore has no bearing on the admissibility in federal court of communications intercepted pursuant to that wiretap. As long as the state wiretap complied with federal law, the communications intercepted pursuant to the state wiretap will be admissible in federal court, even if the state wiretap did not comply with state law. *Id.*; *United States v. Hall*, 543 F.2d 1229, 1234–35 (9th Cir. 1976) ("[W]iretap evidence obtained in violation of neither the Constitution nor federal law is admissible in federal courts, even though obtained in violation of state law.") (quoting *United States v. Keen*, 508 F.2d 986, 989 (9th Cir. 1974)). Therefore, even if the Court accepted Amador's argument that the state wiretap was based on probable cause that Amador was dealing marijuana in furtherance of the MS-13 enterprise, this violation would only amount to a wiretap that did not comply with state law. Since this violation of state law does not govern admissibility of the wiretapped evidence in federal court, the Court should still deny Amador's motion to suppress.

Amador cites *United States v. Butz*, 982 F.2d 1378 (9th Cir. 1993) for the proposition that "state wiretap law must be complied with" where state wiretap law is more restrictive than federal wiretap law. (Dkt. 226, Mot. to Suppress, p. 17). *Butz* is no help to Amador. In *Butz*, the defendants moved to suppress evidence derived from unlawful state pen registers and wiretap evidence that was obtained by relying, in part, on the state pen registers. *Butz*, 982 F.2d at 1382. The Ninth Circuit held that the officers had acted in good faith in obtaining the state pen registers, and therefore the evidence was admissible. *Id.* at 1382–83. Since it relied on the good faith exception, the Ninth Circuit simply held that the wiretap evidence was admissible and it did not address the question of whether a state law violation would make the intercepted communications inadmissible.[3] *Id.* *Butz* does not control here.

Of course, this Court knows that *Butz* does not control because it has already rejected Amador's

---

[3] And even if the Ninth Circuit had addressed the issues of the admissibility of intercepted communications in federal court, its holding would be inconsistent with the Ninth Circuit's holdings in *Homick* and *Hall*. Since these cases predated *Butz*, they are binding.

UNITED STATES' OPPOSITION TO LORENZO
AMADOR'S MOTION TO SUPPRESS WIRETAP
AND SEARCH WARRANTS

argument. In September 2017, this Court denied a motion to suppress that argued that a wiretap was obtained in violation of state law. *See York*, 2017 WL 5068143, at *3. In footnote three of the order, this Court specifically addressed—and rejected—the same argument Amador makes now: that *Butz* stands for the proposition that state law governs the admissibility in federal court of evidence gathered pursuant to state wiretap orders. *Id.* at *3 n.3. While the parties have changed, the substance of Amador's argument is the same now as when the Court rejected the argument in 2017. This Court should again reject this argument for the same reasons.

C. **This Court should deny Amador's request for a Franks hearing, because Amador has not identified any misleading fact or omission—let alone a material misleading fact or omission—in wiretap 18-002 to support a Franks hearing.**

1. Standard for a Franks Hearing

"In order to receive a Franks hearing, the defendant must make a non-conclusory and substantial preliminary showing that the affidavit contained actual falsity [or an omission], and that the falsity either was deliberate or resulted from reckless disregard for the truth." *United States v. Prime*, 363 F.3d 1028, 1031 n.1 (9th Cir. 2004); *United States v. Meling*, 47 F.3d 1546, 1553 (9th Cir. 1995). A defendant must also demonstrate that the alleged falsity or omission is material. *United States v. Chavez Miranda*, 306 F.3d 973, 979 (9th Cir. 2002). A false inclusion or an omission is not material unless the affidavit, purged of its defects, would be insufficient to support a finding of probable cause or necessity. *Meling*, 47 F.3d at 1553; *United States v. Bennett*, 219 F.3d 1117, 1124 (9th Cir. 2000).

A defendant "bears the burden of proof and must make a substantial showing to support both elements." *Chavez Miranda*, 306 F.3d at 979 (emphasis added). Therefore, if the defendant fails to make a "substantial preliminary showing" of either intentional or reckless inclusion or omission, or materiality, the district court should not conduct a *Franks* hearing. *See United States v. Shryock*, 342 F.3d 948, 976–77 (9th Cir. 2003) (denial of hearing would have been correct, even if affidavit contained the alleged misleading statements and omissions, because they were not required for the finding of necessity); *Bennett*, 219 F.3d at 1124–25 (proper to refuse *Franks* hearing where defendant satisfied recklessness requirement but did not show materiality).

In *Franks*, the Supreme Court "was careful . . . to avoid creating a rule which would make evidentiary hearings into an affiant's veracity commonplace, obtainable on a bare allegation of bad faith.

UNITED STATES' OPPOSITION TO LORENZO
AMADOR'S MOTION TO SUPPRESS WIRETAP
AND SEARCH WARRANTS

It crafted, therefore, a rule of very limited scope." *United States v. Chesher*, 678 F.2d 1353, 1360 (9th Cir. 1982). "To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross examine." *Franks v. Delaware*, 438 U.S. 154, 171 (1978).

2. <u>Amador has identified no facts that were misleading about his use of Target Telephone #6 in the affidavit in support of wiretap 18-002.</u>

Amador requests a *Franks* hearing based solely on his claim that the affiant for Wiretap 18-002 provided the court with "misleading facts as to defendant's residence," which Amador claims created the probable cause to believe that Amador was the user of Target Telephone 6. (Dkt. 226, Mot. to Suppress the Wiretap, p. 20). Amador is wrong, because the affiant did not provide any misleading facts as to Amador's residence.

The affidavit in support of 18-002 explained that Amador was identified as the user of Target Telephone 6 for multiple reasons. First, Target Telephone 6 was subscribed in the name of "Antonio Mejia," the same name Amador used for his Facebook accounts. (Dkt. 229, Attachment 5, Aff. in Support of 18-002 Application, Bates 1770). Second, Target Telephone 6 was also subscribed at 1949 Jennings Street, Mendota, which is the "same address Amador used during his contact with law enforcement on September 18, 2017," at which time Amador identified himself as Lorenzo Amador. (Dkt. 229, Attachment 5, Aff. in Support of 18-002 Application, Bates 1770). Third, Target Telephone 6 was also listed in the phone of another MS-13 member as the phone number for "Catrachh," which was a possible misspelling of Amador's moniker of "Catracho." (Dkt. 229, Attachment 5, Aff. in Support of 18-002 Application, Bates 1770).

It is the second point—that Target Telephone 6 was subscribed at 1949 Jennings Street—that Amador claims was a materially misleading statement. Amador states that the Jennings Street address is the address where Amador's family resides, whereas Amador lived at an address on Oxnard Street in Mendota. (Dkt. 226, Mot. to Suppress the Wiretap, p. 20).

Ironically, by claiming that this statement was misleading, Amador himself makes a material omission—that the affidavit for 18-002 never said that Amador lived at Jennings Street. The reason the affidavit mentioned that Target Telephone 6 was subscribed to an address at Jennings Street is because

Amador himself provided Jennings Street as his address when he was stopped by law enforcement on September 18, 2017. There was therefore no misleading statement about Amador's residence, and no reason for this Court to order a Franks hearing.[4]

3. <u>The statement about Amador's residence was not material, because probable cause would have existed even if the affidavit stated that the Jennings address was Amador's family address.</u>

Even if the alleged "misleading statement" about Amador's residence were corrected, the statement was not material because the affidavit still had ample probable cause that Amador was the user of Target Telephone 6. The test of materiality is whether the affidavit, when corrected, no longer supports a probable cause finding. *United States v. Morrison*, 988 F.2d 124 (9th Cir. 1993). In the context of a Franks motion, the correct information's inclusion in the affidavit must defeat probable cause for the statement to have been material. *United States v. Bishop*, 264 F.3d 919, 924 (9th Cir. 2001). It is not sufficient that the omission might have affected the outcome; instead the alleged inaccuracies are "irrelevant" if, when they are put to one side, "what is left is sufficient to sustain probable cause." *Franks*, 438 U.S. at 172, n.8.

Here, the statement that the Jennings Street address was his *family* address and not his personal address was not material, because even if the wire had included this statement, this statement would not have in any way undercut the probable cause that Amador was the user of Target Telephone 6:

- Target Telephone 6 was subscribed in the name of "Antonio Mejia," the same name Amador used for his Facebook accounts. (Dkt. 229, Attachment 5, Aff. in Support of 18-002 Application, Bates 1770).

- Target Telephone 6 was also subscribed at 1949 Jennings Street, Mendota, which is the "same address Amador used during his contact with law enforcement on September 18, 2017" at which time Amador identified himself as Lorenzo Amador. (Dkt. 229, Attachment 5, Aff. in Support of 18-002 Application, Bates 1770).

---

[4] Nor did the affidavit for 18-002 state that Target Telephone 6 was the same phone number listed on Amador's Facebook account, although Amador also makes much of this fact. *See* (Dkt. 226, Mot. to Suppress the Wiretap, p. 20) (claiming that the use of information from the search of the "Mejia Mejia" account—which listed Target Telephone 6 as Amador's phone number—"to support cause for this wiretap would taint the wiretap applications").

1  • Target Telephone 6 was also listed in the phone of another MS-13 member as the phone

2     number for "Catrachh," which was a possible misspelling of Amador's moniker of

3     "Catracho."  (Dkt. 229, Attachment 5, Aff. in Support of 18-002 Application, Bates

4     1770).

5     And the addition:

6  • 1949 Jennings Street, Mendota, is the address of Amador's family.  Amador lives on

7     Oxnard Street in Mendota.

8     Adding in the statement that Jennings is Amador's family address does not undercut the

9  probable cause that Amador was the user of Target Telephone 6.  The significance of the Jennings

10 address is that Amador provided police with the same address that Target Telephone 6 was subscribed

11 to.  Adding in that this address was, in fact, Amador's family address further strengthens the probable

12 cause that Target Telephone 6 was Amador's phone.  At worst, it makes no difference in the probable

13 cause analysis.  Therefore, this alleged "misleading statement" is not material, and not the basis for the

14 Court to order a *Franks* hearing.

15     **D.**     **The Court should deny Amador's motion to suppress the federal search warrants**
              **for his alleged Facebook accounts, because he has not presented evidence that the**
16            **accounts were his and that he has standing to challenge the search of the accounts.**

17     The United States incorporates by reference the argument it makes in its Opposition to Amador's

18 Motion to Suppress the Search of 163 Facebook Accounts: that Amador has not presented any evidence

19 to prove that he has standing to challenge the search of these Facebook accounts. In short, Amador bears

20 the burden to establish that he has standing to challenge the search of any Facebook account, and he

21 must do so by presenting evidence to establish his standing.  *United States v. Zermeno*, 66 F.3d 1058,

22 1062 (9th Cir. 1995).  He may not simply rely on "the government's allegations in the pleadings, or the

23 positions the government has taken in the case, to establish standing." *Id.*

24     Since Amador has not presented any evidence to claim that the Facebook pages he moves to

25 suppress are his own, he does not have standing to challenge their search.  *Id.* ("It was Zermeno's

26 obligation to present evidence of his standing, or at least to point to specific evidence in the record

27 which the government presented and which established his standing. He did not do so. Accordingly, he

28 may not challenge the search of the Adrienne Street house as a violation of the Fourth Amendment.").

**E.** **The Court should deny Amador's motion to suppress the federal search warrants for his Facebook accounts, because both warrants were supported by probable cause that Amador was using his accounts to distribute marijuana and using his accounts to communicate with other members of MS-13, which is a wholly illegitimate enterprise.**

1. Probable Cause

Probable cause exists when there is a fair probability of criminal activity. *Gates*, 462 U.S. at 235. "It is well-settled that the determination of probable cause is based upon the totality of the circumstances known to the officers at the time of the search." *United States v. Bishop*, 264 F.3d 919, 924 (9th Cir. 2001). A reviewing magistrate may draw reasonable inferences. *Gates*, 462 U.S. at 240. "Additionally, issuing judges may rely on the training and experience of affiant police officers." *United States v. Chavez-Miranda*, 306 F.3d 973, 978 (9th Cir. 2002). The Court owes "great deference" to a magistrate's probable cause finding. *United States v. Krupa*, 658 F.3d 1174, 1177 (9th Cir. 2011). Suppression of a search warrant is inappropriate unless the reviewing judge lacked a substantial basis for finding probable cause. *United States v. Ocampo*, 937 F.2d 485, 490 (9th Cir. 1991).

An affiant may state conclusions based on his training and experience to support a search warrant. *United States v. Garay*, 938 F.3d 1108, 1113 (9th Cir. 2019). Magistrate judges may "rely on the conclusions of experienced law enforcement officers regarding where evidence of a crime is likely to be found." *Id.* (quoting *United States v. Fannin*, 817 F.2d 1379, 1382 (9th Cir. 1987)). In addition, magistrate judges may "draw their own reasonable inferences about where evidence might be kept based on the nature of the suspected offense and the nature of the evidence sought." *Id.* at 1114.

2. Association with a wholly illegitimate RICO is itself a basis for probable cause to search for evidence of the enterprise.

Association with a RICO enterprise is a basis for probable cause for a search warrant when the enterprise is "wholly illegitimate." *United States v. Rubio*, 727 F.2d 786 (9th Cir. 1983). A search warrant must present probable cause that the search will uncover evidence that "will aid in a particular apprehension or conviction." *Warden v. Hayden*, 387 U.S. 294, 306–07 (1967). In a RICO prosecution, the United States must prove that the defendant associated with a RICO enterprise. 18 U.S.C. § 1962(c); *see Rubio*, 727 F.2d at 792. In RICO investigations, therefore, evidence of association with the RICO enterprise is evidence that "will aid in a particular apprehension or conviction." *Warden*, 387 U.S.C at

306–07.

The Ninth Circuit has recognized that where the government has probable cause that an organization is a RICO enterprise, "any evidence relevant to prove any element of the RICO offense," including association, "is potentially seizable." *Rubio*, 727 F.2d at 793. To protect the countervailing First Amendment right of association, however, the Ninth Circuit clarified that evidence of enterprise membership alone is not sufficient to provide probable cause for a search unless the government made "a showing that such a large portion of the RICO enterprise's activities are illegitimate so that the entire enterprise, in effect, becomes wholly illegitimate." *Id.* In *Rubio*, the Ninth Circuit found that the government had not met this standard because the search warrant did not contain any facts to establish that the RICO enterprise it was investigating—a Hells Angels chapter—had engaged in racketeering activity. *Id.* at 794. But the Ninth Circuit clarified that the outcome would have been different if "such a large portion of the subject organization's activities [were] illegitimate" that the entire enterprise would be considered "wholly illegitimate." *Id.* at 793. If the enterprise were "wholly illegitimate," then "there would certainly be cause to believe that evidence of a suspect's association with that enterprise would aid in a RICO conviction." *Id.*; *see also United States v. Vasquez*, 654 F.3d 880, 883-84 (9th Cir. 2011) (recognizing that indicia of membership is not evidence of criminal activity unless the entire enterprise was wholly illegitimate, which the Hells Angels Club was not).

Two district courts have held that association with a RICO enterprise is sufficient for probable cause for a search warrant. In *United States v. Arnold*, No. 15-20652, 2017 WL 4036312, at *2 (E.D. Mich. Sept. 13, 2017), the district court found sufficient probable cause for a search warrant for the defendants' Facebook profiles. The district court noted that the search warrant made "no allegation that anything posted in the Accounts [was] illegal," but the search warrant detailed that an enterprise existed (the "Seven Mile Bloods"), that the defendants were members of the enterprise, and that members of the enterprise commonly used social media to discuss enterprise business. *Id.* at *2–3. The Court found this association with a RICO enterprise sufficient to support the probable cause for the Facebook search warrant. *Id.* at *3.

Likewise, in *United States v. Acosta*, a district court found that there was probable cause for a search warrant that alleged that the defendants were members of the Latin Kings and the Latin Kings

was a RICO enterprise. 110 F. Supp. 2d 918, 933 (E.D.Wi. 2000). Citing *Rubio*, the district court noted that the affidavit contained "extensive information" regarding the Latin Kings criminal organization, and found that the affidavit therefore "provided probable cause to believe that such a large portion of the Latin Kings' activities were illegitimate that the enterprise could be considered in effect wholly illegitimate" and thus association with the Latin Kings was sufficient to establish probable cause for a search. *Id.*

        3.    <u>Substantial evidence supported the magistrate judges' findings of probable cause because Amador was using his Facebook accounts to distribute marijuana and to communicate with fellow members of the MS-13 enterprise, which is a "wholly illegitimate" enterprise.</u>

        Probable cause existed to search the "Antonio Mejia" and "Mejia Mejia" accounts for two reasons. First, there was substantial evidence that Amador was using Subject Account 32 to distribute marijuana and that the search of the three related accounts would also reveal evidence of marijuana. The affidavit explained that on multiple occasions, Subject Account 32 was used to discuss marijuana with Wilber Lainez. (Dkt. 230, Attachment 9, First Facebook Warrant, Bates 4040–4041). Amador used Subject Account 32 to send Lainez a message asking if Lainez had "more weed" and could give him "a 20." (Dkt. 230, Attachment 9, First Facebook Warrant, Bates 4041). Amador also told Lainez that he had been stopped with "weed" and "a switchblade in the bag." (Dkt. 230, Attachment 9, First Facebook Warrant, Bates 4041). And on a different occasion Amador also agreed to come with Lainez to pick up marijuana from another individual. (Dkt. 230, Attachment 9, First Facebook Warrant, Bates 4041). These comments establish that Amador was using Subject Account 32 to discuss marijuana distribution with Lainez, and therefore there was probable cause to search Subject Account 32, as Amador himself concedes. (Dkt. 226, Mot. to Suppress Wiretap, p. 21) ("Only the 'Antonio Mejia' account[, i.e. Subject Account 32,] ending in 21558 had a factual basis for its search.").

        The other three accounts could also be searched based on probable cause that they were being used by the same person who was using Subject Account 32 to discuss marijuana distribution. The affidavit set forth probable cause to believe the other accounts were used by the same user of Subject Account 32. Subject Account 33 had multiple selfies of an individual believed to be Mario Garcia, including one of the same photos displayed in Subject Account 32. (Dkt. 230, Attachment 9, First

Facebook Warrant, Bates 4041). This account also had "several images consistent with MS-13 gang member drawings" and the Facebook account was "friends with several accounts that ha[d] been identified as active accounts by active MS-13 gang members," including Barrera. (Dkt. 230, Attachment 9, First Facebook Warrant, Bates 4041). Subject Account 34 also had four selfie-style photographs of an individual believed to be Mario Garcia, including two of the same photos as in Subject Account 32. (Dkt. 230, Attachment 9, First Facebook Warrant, Bates 4041–4042). And finally, Subject Account 35 also had several selfie-style photographs of an individual believed to be Mario Garcia, including several photographs of the individual believed to be Garcia that appeared to be the same photographs displayed in the other accounts. (Dkt. 230, Attachment 9, First Facebook Warrant, Bates 4042).

The affidavit also established that, based on the affiant's training, experience, and participation in the investigation, "much of the communication between these [MS-13] gang members, and their associates are through Facebook messenger," and that MS-13 members often use "multiple Facebook accounts." (Dkt. 230, Attachment 9, First Facebook Warrant, Bates 4013). In addition, the affidavit explained that gang members often use social media to discuss their gang-related crimes. (Dkt. 230, Attachment 9, First Facebook Warrant, Bates 4045). These statements of training and experience combine with the fact that Amador was using Subject Account 32 to discuss marijuana distribution to form a substantial basis for probable cause that (1) Amador had other Facebook accounts as an MS-13 member; and (2) Amador was using his other Facebook accounts to discuss gang-related crimes, including marijuana distribution, as he had on Subject Account 32. *See Garay*, 938 F.3d at 1113–14 (noting that magistrate judges may "rely on the conclusions of experienced law enforcement officers regarding where evidence of a crime is likely to be found" and also "draw their own reasonable inferences about where evidence might be kept based on the nature of the suspected offense and the nature of the evidence sought").

Second, there was substantial evidence that MS-13 was a wholly illegitimate enterprise and that a search of the accounts of MS-13 members—including the four accounts attributed to Amador—would reveal evidence of this enterprise. The affidavits established that MS-13 was a wholly illegitimate enterprise. The affidavit described in detail the criminal activities of MS-13 (violence, murder,

narcotics, extortion, and illegal firearms). The government designated MS-13 a Transnational Criminal Organization and, as a result, U.S. authorities could freeze and seize the assets of members and associates, and U.S. citizens were prohibited from engaging in transactions with them. (Dkt. 230, Attachment 9, First Facebook Warrant, Bates 4004). In Mendota, the gang engaged in a pattern of murder, extortion, kidnapping, assault, and drug dealing, all of which were discussed in the affidavit. (Dkt. 230, Attachment 9, First Facebook Warrant, Bates 4008).

No legitimate purpose for the MS-13 gang has been identified. The central purpose of the gang is establishing and maintaining a reputation for violence. *United States v. Palacios*, 677 F.3d 234, 249 (9th Cir. 2012); *United States v. Mejia*, 545 F.3d 179, 203 (2d Cir. 2008). Even the lowest level parros must run errands for MS-13 members (hence providing support to the RICO enterprise) and committing crimes on behalf of MS-13. (Dkt. 230, Attachment 9, First Facebook Warrant, Bates 4009). Chequeos, the next level, must fight with rival gang members and expand the gang's territory. (Dkt. 230, Attachment 9, First Facebook Warrant, Bates 4009). They must kill three people to rise to the next level. (Dkt. 230, Attachment 9, First Facebook Warrant, Bates 4011).

The affidavit also set forth probable cause to explain why a search of the Facebook accounts of MS-13 members would reveal evidence of the wholly illegitimate enterprise. As the affidavit states, MS-13 members use multiple Facebook accounts to communicate about the gang, and rules of the enterprise require MS-13 members to communicate discuss and report gang business: they must "maintain communication" with other members, "report all business," and "report accounts every last or beginning of the month." (Dkt. 230, Attachment 9, First Facebook Warrant, Bates 4011–4013). Therefore, there was substantial evidence to support the finding that there was probable cause to believe that searching four Facebook accounts of Amador, an MS-13 member, would reveal evidence of this wholly illegitimate enterprise, because a search would likely reveal evidence of the MS-13 enterprise, which Amador was required to report to his fellow MS-13 members.

This search warrant is therefore almost identical to the warrant the Court upheld in *Arnold*, 2017 WL 4036312, at *2–3, in which the court found probable cause to search the Facebook accounts of the defendants based on their membership in the Seven Mile Bloods, a wholly illegitimate enterprise. Like the Seven Mile Bloods, MS-13 in Mendota is a wholly illegitimate enterprise engaged in racketeering

activity, as the affidavit sets forth.  Since the MS-13 enterprise is wholly illegitimate, and there was probable cause to believe the enterprise was engaged in racketeering activity, "there would certainly be cause to believe that evidence of a suspect's association with that enterprise would aid in a RICO conviction."  *Rubio*, 727 F.2d at 793.  This Court should deny Amador's motion to suppress these search warrants.

### IV.　　CONCLUSION

This Court should deny Amador's motion in its entirety.

Dated:  December 2, 2019

McGREGOR W. SCOTT
United States Attorney

By:  /s/ ROSS PEARSON
ROSS PEARSON
Assistant United States Attorney

UNITED STATES' OPPOSITION TO LORENZO
AMADOR'S MOTION TO SUPPRESS WIRETAP
AND SEARCH WARRANTS